**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, et al.,**<br><br>    **Plaintiffs,**<br><br>        v.<br><br>**FEDERAL ELECTION COMMISSION,**<br><br>    **Defendant.** | Civil Action No. 10-1350 (JEB) |

**MEMORANDUM OPINION**

Citizens for Responsibility and Ethics in Washington (CREW) and its Executive Director, Melanie Sloan, bring this suit alleging that the Federal Election Commission wrongfully dismissed their administrative complaint. In addition, they claim that the Commission did not provide timely notice of the dismissal or the reasons therefor. Because Plaintiffs have not sufficiently articulated a concrete and particularized injury, they lack standing to pursue these claims.[1]

**I.    Factual Background**

   A.    FECA

The Federal Election Campaign Act (FECA), 2 U.S.C. §§ 431 *et seq.*, as amended by the Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, seeks to remedy any actual or perceived corruption of the political process through contribution and expenditure limitations as well as recordkeeping and disclosure requirements. See Federal Election Commission v. Akins,

---

[1] The Court has reviewed Plaintiffs' Amended Complaint, Defendant's Motion to Dismiss, Plaintiffs' Opposition, and Defendant's Reply.

524 U.S. 11, 14 (1998).  The Federal Election Commission (FEC) is the independent, executive-branch agency that oversees the implementation and administration of FECA.  2 U.S.C. § 437c.  The Commission is composed of six voting members, no more than three of whom may be affiliated with the same political party, who are appointed by the President and confirmed by the Senate.  § 437c(a)(1).

The FEC is the exclusive civil enforcement authority for violations of FECA.  §§ 437c(b)(1); 437d(e).  Any person who believes that a violation of the Act has occurred may file a signed and sworn complaint with the FEC.  § 437g(a)(1).  Upon receipt of a complaint, the FEC must, within five days, notify the person or persons alleged in the complaint to have committed such a violation.  Id.  The subjects of the complaint then have fifteen days to demonstrate to the FEC that no action should be taken against them on the basis of the complaint.  Id.  If the Commission determines, by a vote of at least four of its members, that it has "reason to believe that a person has committed, or is about to commit, a violation," the Commission must conduct an investigation.  § 437g(a)(2).  After the investigation, the General Counsel of the Commission then makes a recommendation regarding how to proceed by filing with the Commission a "brief stating the position of the general counsel on the legal and factual issues of the case."  § 437g(a)(3).  After considering this recommendation, the Commission then determines how to proceed – *e.g.*, it may dismiss the complaint, attempt to correct or prevent the violation, enter into a conciliation agreement with any person involved, or institute enforcement proceedings up to and including a civil suit in federal district court against the violators.  See §§ 437g(a)(4)-(6).

If at any time the Commission votes to dismiss a complaint filed under § 437g(a)(1), the filer may seek judicial review.  § 437g(a)(8).  Section 437g(a)(8) provides the timeline and legal standard for such an action:

> (A) Any party aggrieved by an order of the Commission dismissing a complaint filed by such party under paragraph (1), or by a failure of the Commission to act on such complaint during the 120-day period beginning on the date the complaint is filed, may file a petition with the United States District Court for the District of Columbia.
>
> (B) Any petition under subparagraph (A) shall be filed, in the case of a dismissal of a complaint by the Commission, within 60 days after the date of the dismissal.
>
> (C) In any proceeding under this paragraph the court may declare that the dismissal of the complaint or the failure to act is contrary to law, and may direct the Commission to conform with such declaration within 30 days, failing which the complainant may bring, in the name of such complainant, a civil action to remedy the violation involved in the original complaint.

In determining whether the Commission's decision to dismiss a complaint (also known as a "Matter Under Review" or "MUR") was contrary to law, the Court may review the General Counsel's brief in cases where the General Counsel recommended dismissal, see FEC v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 38 n.19 (1981), or the Commission's "Statement of Reasons" in cases where the Commission declined to follow the General Counsel's recommendation to proceed with the case. See Common Cause v. FEC, 108 F.3d 413, 415 (D.C. Cir. 1997).

B.   CREW

CREW is a § 501(c)(3) non-profit corporation that "uses a combination of research, litigation, and advocacy to advance its mission" of "ensuring the integrity of government officials and [] protecting the right of citizens to be informed about the activities of government officials." Am. Compl., ¶ 5. In furtherance of this goal, CREW and its Executive Director, Plaintiff Melanie Sloan, "monitor[] the campaign finance activities of those who run for federal office and publicize[] those who violate federal campaign finance laws through its website, press

releases, reports, and other methods of distribution." Id. at ¶ 6. CREW also "files complaints with the FEC when it discovers violations" of FECA. Id.

### C. The Current Action

Plaintiffs initiated this case on August 11, 2010, and filed their Amended Complaint on October 28, 2010. Plaintiffs' claims arise from the FEC's decision to dismiss MUR 5908, an administrative complaint Plaintiffs filed against Peace Through Strength Political Action Committee (PTS PAC) and its treasurer, Meredith Kelley, on March 14, 2007. Id., ¶ 33; Opp., Exh. 1 (Federal Election Commission Complaint In the Matter of: Peace through Strength PAC and Meredith Kelley, Treasurer).

PTS PAC was the political action committee of Representative Duncan Hunter, who was a candidate for President of the United States during the 2008 election. Am. Compl., ¶ 33. Plaintiffs generally complained that PTS PAC provided support to Hunter, in violation of FECA, both during the "testing the waters" phase before he officially entered the presidential race, as well as after he registered his principal campaign committee, Hunter for President (also called the Hunter Committee). See FEC Complaint. More specifically, Plaintiffs' administrative complaint alleged four separate counts against PTS PAC. First, Plaintiffs alleged that Hunter "traveled extensively to early presidential primary states . . . using PTS PAC to 'test the waters' for his presidential candidacy," id., ¶ 25; by receiving 11 individual contributions (totaling $52,650) that exceeded FECA's $2,300 individual contribution limit to an individual engaged in "testing the waters," PTS PAC knowingly accepted $27,350 in excessive contributions in violation § 441a(f). Id., ¶ 27. Second, Plaintiffs alleged that because PTS PAC expended over $5,000 on advertisements designed to publicize Hunter's intention to campaign for federal office, it was required to register with the FEC as Hunter's principal campaign committee, but failed to do so in violation of § 433(a). Id., ¶¶ 23-31. Third, Plaintiffs alleged that by paying an amount

in excess of $5,000 for PTS PAC advertisements featuring Hunter after the formation of Hunter for President, PTS PAC made excessive in-kind contributions to Hunter for President in violation of § 441a(a)(2)(A) and 11 C.F.R. § 110.2(b)(1).  Id., ¶¶ 32-35.  Finally, Plaintiffs alleged that to the extent PTS PAC had failed to report disbursements for certain television advertisements in December 2006, it violated 11 C.F.R. §§ 104.3(b) and 104.9(a).  Id., ¶¶ 36-37.

      After reviewing the administrative complaint and PTS PAC's response, the FEC's General Counsel prepared an initial report recommending that the Commission find reason to believe that PTS PAC, Meredith Kelley, Duncan Hunter, Hunter for President, and Treasurer Bruce Young had violated FECA.  Opp., Exh. 3 (First General Counsel's Report).  The First General Counsel's Report did not address CREW's claims exactly as they appeared in the administrative complaint, but instead found somewhat different violations.  Although Plaintiffs' administrative complaint had focused on the advertisements paid for by PTS PAC, this Report concluded that while "the television ads that are the primary focus of the complaint did not constitute an in-kind contribution to Hunter's presidential campaign or cause Hunter to trigger candidate status, it appears that other PTS PAC disbursements did lead to violations of the Act." Id. at 3.  Specifically, the General Counsel recommended that the Commission find reason to believe that: (1) Duncan Hunter failed to timely file a Statement of Candidacy and to maintain records of contributions received and expenditures made while he was "testing the waters"; (2) Hunter for President, Inc. and its Treasurer, Bruce Young, failed to report contributions received and expenditures made by Hunter during the "testing the waters" period after it had registered as Hunter's principal campaign committee and was required to file reports of receipts and disbursements with the Commission; and (3) PTS PAC and its Treasurer, Meredith Kelley, made excessive in-kind contributions to Duncan Hunter for his Presidential campaign and that Duncan

Hunter and Hunter for President, Inc. and Bruce Young accepted excessive contributions. Id. The potentially excessive in-kind contributions identified in this Report related not to the advertisements funded by PTS PAC, but rather to PTS PAC's funding of Hunter's travel to early primary states during his "testing the waters" phase. Id. at 11. The General Counsel recommended that the Commission "take no action at this time" regarding the allegations that PTS PAC and Meredith Kelley failed to report disbursements for the television advertisements run in December 2006. Id. at 3.

Based on the First General Counsel's Report, the Commission found reason to believe that violations of FECA had occurred, see Am. Compl., ¶ 35, and conducted an investigation of the issues raised by MUR 5908. Following the investigation, the General Counsel prepared her second report to the Commission. See Opp., Exh. 4 (General Counsel's Report #2). Portions of Report #2 are redacted, including some of the General Counsel's recommendations. See, e.g., id. at 3, 13-15. The public portions of this Report, however, reveal that PTS PAC expended $10,243 on Hunter's "testing-the-waters" travel between November 2006 and January 2007, and the "investigation confirmed that PTS PAC violated 2 U.S.C. §§ 441a(a)(2) and 434(b), by making and failing to report excessive in-kind contributions to the Hunter Committee and that Hunter and the Hunter Committee violated 2 U.S.C. §§ 441a(f) and 434, by accepting and failing to report PTS PAC's excessive in-kind contributions." Id. at 2-3. With respect to allegations that Hunter was late in filing his Statement of Candidacy, the General Counsel recommended that "[b]ecause the Statement of Candidacy was only three days late, . . . we are not recommending the Commission pursue a civil penalty for these violations." Id. at 10-11. She again recommended that the Commission find no reason to believe PTS PAC and Meredith

Kelley violated §§ 434(b) and 441a(a)(2) with respect to the televisions advertisements. Id. at 15.

Having received both General Counsel's Reports, the FEC voted to dismiss MUR 5908 on June 29, 2010, thereby triggering Plaintiffs' 60-day clock in which to appeal the dismissal. Am. Compl., ¶¶ 47, 36. In its Statement of Reasons for dismissing CREW's administrative complaint, the Commission addressed CREW's allegations regarding excessive contributions and reporting violations. See Mot., Exh. 1 (Statement of Reasons). The Commission explained:

> The Commission's investigation indicates that PTS PAC made approximately $10,200 in disbursements for travel expenses incurred during approximately the same time that Congressman Hunter was testing the waters for his presidential campaign. . . . PTS PAC is subject to a maximum contribution limit of $5,000. Therefore, if any of the disbursements at issue were on behalf of the Hunter Committee, they would have resulted in up to $10,200 in in-kind contributions that were not reported, of which up to $5,200 would have been excessive. On the other hand, if the disbursements were made solely on behalf of PTS PAC, then no in-kind contributions would have resulted.

Id. at 3. After reviewing the results of the investigation, the Commission observed that

> [n]othing revealed in the Commission's investigation contradicts the conclusion that the travel disbursements advanced PTS PAC's core mission. The Commission notes further that any disbursements benefitting both the presidential campaign and PTS PAC would have been allocable between the two committees. Even if one assumes that PTS PAC and the Hunter Committee benefitted equally from the disbursements, such an allocation would reduce the amount of potentially excessive contributions to just over $100.

Id. The Commission therefore decided that "[i]n light of the relatively small amount potentially in violation," it would "exercise its prosecutorial discretion pursuant to Heckler v. Chaney, 470 U.S. 821, 831 (1985), and take no further action as to the allegations regarding excessive in-kind contributions." Id. The Commission similarly exercised its prosecutorial discretion to dismiss the complaint as to Hunter's alleged late filing of his Statement of Candidacy, finding that any

potential violation would be "*de minimis*" as "his [s]tatement was, at most, three days late." Id. at 4.

In a letter dated July 23 – 24 days after the vote – and received by CREW on July 27, the FEC notified Plaintiffs that MUR 5908 had been dismissed. Am. Compl., ¶ 34. On August 11, 43 days after the Commission had dismissed MUR 5908, Plaintiffs filed their original Complaint in this case. Id., ¶ 38. At that time, the FEC had not yet published its Statement of Reasons for dismissing MUR 5908. Id. On August 23, the FEC posted on its website the Certification of the June 29, 2010, Commission vote to dismiss and the two General Counsel Reports relating to MUR 5908 (dated January 18, 2008, and May 3, 2010). Id., ¶¶ 47-48, 50. By letter dated August 24, 2010, six days before Plaintiffs' window of appeal was set to close, the FEC sent Plaintiffs its Statement of Reasons for dismissing MUR 5908. Id., ¶ 40.

Now that Plaintiffs have been afforded the opportunity to amend their Complaint to take the FEC's Statement of Reasons into account, they currently assert two claims. First, Plaintiffs allege that the FEC wrongfully dismissed MUR 5908 in violation of § 437g(a)(8)(A). Id. at ¶¶ 70-72. Second, Plaintiffs allege that the FEC did not timely notify them of the dismissal, and, moreover, it has an unlawful policy and practice of failing to provide § 437g(a)(8)(A) complainants with the "statutorily mandated 60 days' notice of dismissal and basis of dismissal." Id. at ¶¶ 73-78. Plaintiffs seek declaratory and injunctive relief for these alleged violations.

The FEC has now moved to dismiss Plaintiffs' Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds that Plaintiffs lack standing and have failed to state a claim.

## II. Legal Standard

In evaluating Defendant's Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005). This standard governs the Court's considerations of Defendant's Motion under both Rules 12(b)(1) and 12(b)(6). See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader"); Walker v. Jones, 733 F.2d 923, 925-26 (D.C. Cir. 1984) (same). The Court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint. Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986) (internal quotation marks omitted).

To survive a motion to dismiss under Rule 12(b)(1), Plaintiffs bear the burden of proving that the Court has subject matter jurisdiction to hear their claims. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000). A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). For this reason, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Id. at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987) (alteration in original)).

9

Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens, 402 F.3d at 1253; see also Venetian Casino Resort, L.L.C. v. E.E.O.C., 409 F.3d 359, 366 (D.C. Cir. 2005) ("given the present posture of this case – a dismissal under Rule 12(b)(1) on ripeness grounds – the court may consider materials outside the pleadings"); Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).

**III.    Analysis**

The FEC moves to dismiss both counts of Plaintiffs' Amended Complaint on the grounds that Plaintiffs lack standing and that they have failed to state a claim under § 437g(a)(8). The Court need only reach the first question.

    A.    Wrongful Dismissal of MUR 5908

Plaintiffs allege that the FEC's dismissal of MUR 5908 was "arbitrary, capricious, an abuse of discretion, and contrary to law in violation of 2 U.S.C. § 437g(a)(8)(A)." Am. Compl., ¶ 71. Plaintiffs complain that, "[d]espite the FEC's finding that PTS PAC had made illegal excessive contributions to the Hunter for President campaign, neither PTS PAC nor Hunter for President has ever amended its FEC reports to reflect the in-kind contributions by PTS PAC to Hunter for President. In the absence of these corrections to the public record, it is impossible to determine from any examination of PTS PAC's FEC reports that it made in-kind contributions to Hunter for President." Id., ¶ 51. Plaintiffs assert that they are "therefore entitled to relief in the form of a declaratory order that defendant FEC's failure to require PTS PAC and Hunter for President to amend their FEC reports to reflect the receipt of in-kind contributions by PTS PAC to Hunter for President is contrary to law in violation of 2 U.S.C. § 437g(a)(8)." Id., ¶ 72.

As a threshold matter, Plaintiffs must establish their standing to pursue this claim. Having the right to file an administrative complaint with the FEC does not necessarily give Plaintiffs standing to seek judicial review of the disposition of that complaint in this Court: "Section 437g(a)(8)(A) does not confer standing; it confers a right to sue upon parties who otherwise already have standing." Common Cause, 108 F.3d at 419. The Court must therefore consider whether Plaintiffs have established standing in this case.

Article III of the United States Constitution limits the jurisdiction of the federal courts to resolving "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. A party's standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan, 504 U.S. at 560. To have standing, a party must, at a constitutional minimum, meet the following criteria. First, the plaintiff "must have suffered an 'injury in fact' – an invasion of a legally-protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical[.]"'" Lujan, 504 U.S. at 560 (citations omitted). Second, "there must be a causal connection between the injury and the conduct complained of – the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" Id. (alterations in original) (citation omitted). Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id. at 561 (citation omitted). A "deficiency on any one of the three prongs suffices to defeat standing." U.S. Ecology, 231 F.3d at 24.

The FEC contends Plaintiffs have failed to establish standing to appeal the dismissal of MUR 5908 under prongs one and three of the Lujan test – *i.e.*, they have failed to allege a concrete and particularized injury that may be redressed by a favorable decision. Mot. at 1.

11

As to prong one, Plaintiffs assert that they have suffered <u>informational</u> injuries sufficient to confer standing under the Supreme Court's decision in <u>FEC v. Akins</u>, 524 U.S. 11 (1988). Opp. at 18-19. While recognizing that "CREW and Sloan generally allege an informational interest," the FEC contends that they have "not identified any specific information they allegedly lack, let alone how any missing information would be 'useful in voting.'" Mot. at 13-14 (quoting <u>Common Cause</u>, 108 F.3d at 418). Plaintiffs respond that their Amended Complaint does identify the specific information lacking: "the 'in-kind contributions by PTS PAC to Hunter for President.'" Opp. at 20 (quoting Am. Compl., ¶ 51). Plaintiffs assert that this information would have helped Sloan, as a voter in presidential elections, and CREW, with its mission of disseminating information to the public, to "'evaluate candidates for public office.'" <u>See</u> <u>id.</u> at 19 (quoting in <u>Akins</u>, 524 U.S. at 20).

The Supreme Court in <u>Akins</u> recognized "informational injury" as a basis for standing to challenge the FEC's dismissal of a complaint under § 437g(a)(8)(A). <u>Akins</u> arose from an FEC finding that "the American Israel Public Affairs Committee (AIPAC) is not a 'political committee' as defined by [FECA]" and its subsequent refusal "to require AIPAC to make disclosures regarding its membership, contributions, and expenditures that FECA would otherwise require." <u>Id.</u> at 13. The plaintiffs, a group of voters with views often opposed to AIPAC's, sought to challenge that determination by appealing the dismissal of their administrative complaint under § 437g(a)(8). <u>Id.</u> at 15-18. The government argued that the plaintiffs lacked standing because they had not suffered an "injury in fact." <u>Id.</u> at 19.

The Supreme Court found that the "injury of which respondents complain – their failure to obtain relevant information – is injury of a kind that FECA seeks to address." <u>Id.</u>, 524 U.S. at 20 (citing <u>Buckley v. Valeo</u>, 424 U.S. 1, 66-67 (1976) ("political committees" must disclose

12

contributors and disbursements to help voters understand who provides which candidates with financial support)). The Supreme Court described the informational injury suffered by the Akins plaintiffs as follows:

> The "injury in fact" that respondents have suffered consists of their inability to obtain information – lists of AIPAC donors (who are, according to AIPAC, its members), and campaign-related contributions and expenditures – that, on respondents' view of the law, the statute requires that AIPAC make public. There is no reason to doubt their claim that the information would help them (and others to whom they would communicate it) to evaluate candidates for public office, especially candidates who received assistance from AIPAC, and to evaluate the role that AIPAC's financial assistance might play in a specific election. Respondents' injury consequently seems concrete and particular. Indeed, this Court has previously held that a plaintiff suffers an "injury in fact" when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute.

524 U.S. at 21 (citing Public Citizen v. Department of Justice, 491 U.S. 440, 449 (1989)).

Since Akins, the D.C. Circuit has had several occasions to consider the reach of "informational injury" standing in the context of § 437g(a)(8) claims. In Common Cause, that court considered whether Common Cause had standing to appeal the FEC's dismissal of its administrative complaint against the National Republican Senatorial Committee and the Montana Republican Party. 108 F.3d 413. The court observed that in a claim based on informational-injury standing "the nature of the information allegedly withheld is critical to the standing analysis." Id. at 417. If, the court held, "the information withheld is simply the fact that a violation of FECA has occurred, neither Common Cause nor its members have suffered the type of injury we recognized in Akins." Id. The court explained: "To hold that a plaintiff can establish injury in fact merely by alleging that he has been deprived of the knowledge as to whether a violation of the law has occurred would be tantamount to recognizing a justiciable interest in the enforcement of the law. This we cannot do." Id. at 418; see also Judicial Watch,

13

Inc. v. FEC, 180 F.3d 277, 278 (D.C. Cir. 1999). On the other hand, the court suggested in *dicta*, if "Common Cause were asserting an interest in knowing how much money a candidate spent in an election, infringement of such an interest may, under Akins, constitute a legally cognizable injury in fact." 108 F.3d at 418. The court did not reach this question, however, as Common Cause did not allege a violation of such an interest. Id.

In Wertheimer v. FEC, 268 F.3d 1070 (D.C. Cir. 2001), the D.C. Circuit again analyzed the plaintiffs' standing to appeal an FEC dismissal under § 437g(a)(8), this time arising from claims under both FECA and the Presidential Election Campaign Fund Act. The Wertheimer plaintiffs alleged that "notwithstanding the Fund Act's prohibition on presidential candidates [who had accepted public financing] accepting contributions from private sources, during the 1996 and 2000 presidential campaigns the two major political parties were funding campaign advertisements furthering the election of their respective presidential nominees in close coordination with those candidates." Id. at 1071. Through their suit, plaintiffs sought "a declaration that expenditures by political parties that further the election of their respective presidential candidates, and that are coordinated with those presidential candidates, constitute contributions to and expenditures by such presidential candidates within the meaning of the Fund Act," and which must be publicly disclosed under FECA. Id. The FEC challenged the plaintiffs' standing there as well.

To establish their standing, the Wertheimer plaintiffs alleged they had been injured by the Commission's "failure . . . to implement and construe [FECA] to identify coordinated expenditures by the major political parties to further the election of their publicly financed nominees as impermissible 'contributions' and 'expenditures,'" including by denying them

14

information. Id. at 1073. The "FEC's failure," the plaintiffs alleged, "deprived them of required information about the source and amount of candidates' financing." Id.

The D.C. Circuit found that the Wertheimer plaintiffs had failed to allege an injury in fact. The court concluded:

> [U]nder the Akins test, appellants have failed to show either that they are directly being deprived of any information or that the legal ruling they seek might lead to additional factual information. To be sure, presidential candidates are subject to FECA's disclosure and reporting requirements. And FECA requires political parties to report each disbursement and to label coordinated expenditures as a discrete category. Yet, appellants' counsel did not dispute that all political parties currently report all disbursements or that each transaction appellants allege is illegal is reported in some form. During oral argument, counsel for appellants was asked what facts, specifically, were not being disclosed. Counsel responded that the 'fact' of 'coordination' was being withheld. But 'coordination' appears to us to be a legal conclusion that carries certain law enforcement consequences. . . . As far as we can determine, appellants do not really seek additional facts but only the legal determination that certain transactions constitute coordinated expenditures. If so, candidates would be required to report allegedly coordinated expenditures, which currently only political parties disclose, as disbursements. But that would mean that appellants only seek the same information from a different source. Any such increase in information resulting from the imposition of duplicative reporting requirements seems trivial.

Id. at 1074-75. The court therefore dismissed the case for lack of standing.

In this case, a review of Plaintiffs' Amended Complaint, the two General Counsel's Reports, and the FEC's Statement of Reasons reveals that, like the Wertheimer plaintiffs, CREW and Sloan have suffered no informational injury. The amount of money PTS PAC spent on Hunter's travel during the "testing the waters" stage of his campaign is publicly available online in the General Counsel's Report #2, see Opp., Exh. 4; Am. Compl., ¶ 47, and does not appear to be in dispute. See Am. Compl., ¶ 42 ("PTS PAC made approximately $10,200 in disbursements for travel expenses incurred during the same time Congressman Hunter was 'testing the waters'

for his presidential campaign."). Chart A of Report #2 lists the public events to which Hunter travelled during the relevant time period and a breakdown showing the portion of PTS PAC's $10,243 in expenditures paid for each of those trips. Opp., Exh. 4 at 5. Chart B of Report #2 provides a detailed list of the disbursements PTS PAC made for each relevant advertisement. Id. at 12.

In trying to pinpoint the factual information they lack, Plaintiffs argue: "[P]aragraph 51 of the amended complaint identifies the specific information lacking here: the 'in-kind contributions by PTS PAC to Hunter for President.'" Opp. at 20 (quoting Am. Compl., ¶ 51). To review, the Hunter Committee had argued that, at a minimum, the $10,243 should be allocable between PTS PAC and the Hunter Committee, respectively, on a 60%-40% basis. Report #2 at 8. Such an allocation would result in less than $5,000 in in-kind contributions by PTS PAC to Hunter, which would not be excessive under § 441a and 11 C.F.R. § 110.2(b)(1). The General Counsel rejected this suggested allocation, and instead reported to the Commission that the information gathered from the investigation showed that PTS PAC had, by paying for Hunter's travel, made excessive in-kind contributions. Id. at 9. The Commission, however, declined to adopt the General Counsel's recommendation, instead finding: "[A]ny disbursements benefitting both the presidential campaign and PTS PAC would have been allocable between the two committees. Even if one assumes that PTS PAC and the Hunter Committee benefitted equally from the disbursements, such an allocation [*i.e.*, $5,100 each] would reduce the amount of potentially excessive contributions to just over $100." Statement of Reasons at 3. The Commission, invoking its prosecutorial discretion, dismissed the claim.

While this may not have been their preferred outcome, it does not deprive Plaintiffs of any information under Wertheimer. Much like "coordination," classifying a particular

disbursement as an "in-kind contribution" "appears to us to be a legal conclusion that carries certain law enforcement consequences. . . . As far as we can determine, [Plaintiffs] do not really seek additional facts but only the legal determination that certain transactions constitute" in-kind contributions. Wertheimer, 268 F.3d at 1075.

CREW and Sloan simply do not allege any specific factual information they lack that is not already publicly available in the published FEC documents pertaining to MUR 5908. See CREW v. FEC, 475 F.3d 337, 339 (D.C. Cir. 2007) (upholding summary judgment for FEC for lack of standing in part because "any citizen who wants to learn the detail of the transaction . . . can do so by visiting the Commission's website, which contains the list and a good deal more"). Their Opposition reveals what Plaintiffs are actually seeking:

> At bottom, the Commission's arguments flow from a callous disregard for the legal and practical significance of the FECA's reporting requirements. While distinguishing between contributions and expenditures lies at the heart of the FEC's mission, the FEC brushes these distinctions aside, suggesting individuals and entities like the plaintiffs can learn nothing useful from knowing precisely which expenditures an entity made and which contributions a candidate received.

Opp. at 21. Far from asserting even "an interest in knowing how much money a candidate spent in an election," as the D.C. Circuit hinted might suffice as an informational injury, see Common Cause, 108 F.3d at 418, what Plaintiffs want is a reclassification of PTS PAC's disbursements as "in-kind contributions" under FECA. See Am. Compl., ¶ 72. Indeed, as relief, Plaintiffs assert that they "are entitled to . . . a declaratory order that defendant FEC's failure to require PTS PAC and Hunter for President to amend their FEC reports to reflect the receipt of in-kind contributions by PTS PAC to Hunter for President is contrary to law." Id.

This simply does not constitute informational injury. Plaintiffs "have failed to show either that they are directly being deprived of any information or that the legal ruling they seek might lead to additional factual information." Wertheimer, 268 F.3d at 1074. As Plaintiffs' Amended Complaint demands only amended FEC filings to reclassify disbursements of which they are already aware, and which are already part of the public record, this Court cannot find that Plaintiffs have standing to bring their claim for wrongful dismissal of MUR 5908.

### B. Failure to Provide 60 Days' Notice

In Count II, Plaintiffs assert that § 437g(a)(8) of FECA "requires the FEC to provide complainants with 60 days' notice of any dismissal of their complaint and the basis for such dismissal." Am. Compl., ¶ 74. While not contained in any statutory provision, they argue this requirement is necessary "in order to give meaningful effect to the statutory right to judicial review conferred on any 'party aggrieved' by . . . § 437g(a)(8)(A)." Id., ¶ 76. Plaintiffs claim that by not immediately notifying Plaintiffs of MUR 5908's dismissal and by not immediately releasing its Statement of Reasons for the dismissal, the FEC violated Plaintiffs' right to appeal the dismissal within 60 days. Plaintiffs aver that "[b]y the time CREW and Ms. Sloan received [the] notice of dismissal on July 27, 2010, they had only 34 days remaining in which to file such a complaint" under § 437g(a)(8)(B), "notwithstanding the 60-day notice period for filing provided by [FECA]." Id., ¶ 36.

Plaintiffs' complaints, moreover, are not limited to MUR 5908. Rather, they assert that this "is not the first time the FEC has denied CREW the full 60 days in which to seek judicial review of the FEC's dismissal of its complaint." Id., ¶ 52. Plaintiffs' Amended Complaint describes numerous other instances in which the FEC did not immediately notify a § 437g(a)(8) complainant of dismissal – at times CREW, and at times other parties – and did not immediately provide a Statement of Reasons, thereby truncating the 60-day window of appeal. Id., ¶¶ 52-66.

18

Plaintiffs allege that "[i]n nearly all cases the Commission . . . waits days or weeks [after voting to dismiss a complaint] before communicating the outcome of that vote to the parties, and typically waits weeks or months longer before providing the basis for any dismissal." Opp. at 28-29.  This, Plaintiffs argue, is evidence that the FEC has an unlawful "policy and practice of refraining from providing complainants with timely notice of its decisions to dismiss complaints and the basis for those dismissals." Am. Compl., ¶ 56.  Plaintiffs lack standing on this Count as well.

Section 437g(a)(8)(B) states: "Any petition under subparagraph (A) shall be filed, in the case of a dismissal of a complaint by the Commission, within 60 days after the date of the dismissal."  The Act does not give any timeframe in which a complainant must receive notice of the dismissal.  The D.C. Circuit, however, has previously ruled that the 60-day countdown is triggered on the day the Commission votes to dismiss the complaint, not on the day the Commission notifies the complainant of the dismissal.  See Spannaus v. FEC, 990 F.2d 643, 644 (D.C. Cir. 1993); Jordan v. FEC, 68 F.3d 518, 519 (D.C. Cir. 1995).  This Court is, of course, powerless to alter that determination.

Here, CREW and Sloan concededly received notice 28 days after the Commission's vote to dismiss their Complaint.  Am. Compl., ¶ 34.  They similarly received the FEC's Statement of Reasons six days before the deadline expired.  Id., ¶ 40.  Although Plaintiffs had filed their suit by then, they do not allege any prejudice in this case from the disclosure near the end of the 60-day period.  Nor could they since they have since amended their initial Complaint to take the FEC's Statement of Reasons into consideration.  Where no prejudice exists, Plaintiffs have suffered no injury that could confer standing.

To the extent Plaintiffs are alleging a practice of untimely notice, the D.C. Circuit's decision in Jordan is particularly instructive.  In that case, Jordan appealed the FEC's dismissal of his administrative complaint 63 days after the vote to dismiss, but less than 60 days after the FEC had sent his notification.  68 F.3d at 519.  Jordan argued that "starting the clock on the date of dismissal might allow the Commission to avoid review by withholding notice of its decision until the 60-day period expired."  Id.  The court declined to take the bait and remanded the case with directions to dismiss for lack of jurisdiction, writing, "We will face that hypothetical case if and when it arises."  Id.  "For now it is enough to point out that the general counsel's letter to Jordan's attorney was dated July 29, 1991, mailed July 31, 1991, and apparently received on August 1, 1991.  That left Jordan 53 days in which to file his petition."  Id.

If the Court of Appeals believes this issue should be adjudicated only when it arises, this Court will heed that counsel.  This is particularly appropriate where Plaintiffs concede that they do not seek redress for past untimely disclosures.  Opp. at 30.

As a result, the Court must reach the same result on the second count of the Amended Complaint as on the first.

**IV.  Conclusion**

An Order accompanying this Memorandum Opinion will grant Defendant's Motion to Dismiss and enter judgment in favor of the Federal Election Commission.

**SO ORDERED**.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  August 1, 2011